# United States Court of Appeals for the Federal Circuit

---

**WI-LAN INC.,**
*Plaintiff-Appellant*

**v.**

**SHARP ELECTRONICS CORPORATION,**
*Defendant-Appellee*

---

2020-1041

---

Appeal from the United States District Court for the District of Delaware in No. 1:15-cv-00379-LPS, Chief Judge Leonard P. Stark.

-------------------------------------------------

**WI-LAN INC.,**
*Plaintiff-Appellant*

**v.**

**VIZIO, INC.,**
*Defendant-Appellee*

---

2020-1043

---

Appeal from the United States District Court for the District of Delaware in No. 1:15-cv-00788-LPS, Chief Judge Leonard P. Stark.

————————————

Decided:  April 6, 2021

————————————

DANIEL FLETCHER OLEJKO, Bragalone Olejko Saad PC, Dallas, TX, argued for plaintiff-appellant.  Also represented by MONTE BOND, TERRY SAAD.

JOHN C. O'QUINN, Kirkland & Ellis LLP, Washington, DC, argued for all defendants-appellees.  Defendant-appellee Sharp Electronics Corporation also represented by WILLIAM H. BURGESS; ADAM R. ALPER, San Francisco, CA; GIANNI CUTRI, KATHERINE E. RHOADES, Chicago, IL; MICHAEL W. DE VRIES, Los Angeles, CA.

MARK S. DAVIES, Orrick, Herrington & Sutcliffe LLP, Washington, DC, for defendant-appellee VIZIO, Inc.  Also represented by ELIZABETH MOULTON, Menlo Park, CA; STANLEY MARTIN GIBSON, Jeffer Mangels Butler & Mitchell, Los Angeles, CA.

————————————

Before DYK, TARANTO, and STOLL, *Circuit Judges*.

DYK, *Circuit Judge*.

Wi-LAN Inc. appeals two related judgments of the United States District Court for the District of Delaware, on summary judgment in one instance and by stipulation in the other, holding that Sharp Electronics Corporation and Vizio, Inc. did not infringe the asserted claims of U.S. Patent No. 6,359,654 ("the '654 patent") and U.S. Patent No. 6,490,250 ("the '250 patent").  We affirm.

## BACKGROUND

Wi-LAN is the owner of the '654 and '250 patents. The '654 patent concerns "methods to display interlaced video on [a] noninterlaced monitor." '654 patent, abstract. This is also known as "deinterlacing." Interlaced video was developed at the inception of electronic television in 1936 and became the standardized video format adopted by the National Television Systems Committee. Most television sets used interlaced video formats during that time period and for decades afterwards. Interlacing video was developed to prevent a "flicker" effect, an effect that results from the difference in the frame rate of the television set and the frame rate in which a program was filmed. To interlace a video, the video frame is split into two fields, which correspond to the odd and even lines of a video frame. The first field (comprising of data on the odd lines) is scanned onto a television set in the first 1/60th of a second, and the second field (comprising of data on the even lines) is scanned in the next 1/60th of a second. Because the fields are displayed on television sets at a rate of 60 fields per second, the viewer does not notice any missing content and perceives the two fields as a single frame.

The need for deinterlacing arose in the 1980s and 1990s due to the development of higher-quality television sets and the need to display television video signals on computer monitors. All modern television sets use noninterlaced displays. Noninterlaced video, unlike interlaced video, displays an entire frame every 1/60th of a second and allows for increased detail to be displayed on a screen. The '654 patent does not claim to have invented deinterlacing but claims "methods and systems for displaying interlaced video on monitors [that] are non-interlaced." '654 patent, col. 1 ll. 13–15.

The other patent at issue here, the '250 patent, "relates generally to multimedia encoders and specifically [to] an

integrated multimedia stream multiplexer." '250 patent, col. 1 ll. 5–7. A stream multiplexer receives separate audio and video data streams and combines them into a single multimedia data stream. The '250 patent is directed to a system for dynamically adjusting the bit rates of the input audio and video data streams to obtain a combined multimedia data stream with an optimal bit rate.

Vizio currently sells and through 2015 Sharp sold "smart" television sets. On May 11, 2015, Wi-LAN brought suit for patent infringement against Sharp, alleging direct and induced infringement of various claims of the '654 and '250 patents. On September 8, 2015, Wi-LAN filed a similar complaint against Vizio, asserting the same claims of the '654 and '250 patents. The district court did not consolidate the Vizio and Sharp cases but managed the cases in parallel.

Wi-LAN accused Sharp and Vizio of infringing claims 1, 4, and 9 of the '654 patent and claims 1, 4, and 6 of the '250 patent. Claim 1 of the '654 patent is an independent method claim and claims 4 and 9 depend on claim 1. Claim 1 of the '250 patent is an independent apparatus claim and claims 4 and 6 depend on claim 1.

The deinterlacing functions (which allegedly infringe the asserted method claims of the '654 patent) and the components that optimize bit streaming (which allegedly infringe the asserted system claims of the '250 patent) reside on each television set's "system-on-chip." A system-on-chip combines numerous functions of a system (e.g., storage, memory, processing, and control), previously implemented in multiple chip sets, onto a single chip.

On February 27, 2018, the district court issued an order construing certain terms of the '654 patent and the '250 patent. Following the district court's claim construction order, Wi-LAN conceded that that it could not prove infringement of the asserted claims of the '250 patent under the

district court's constructions of "output multimedia data stream" and "a multimedia processor, coupled to the data rate analyzer." These two terms are common to all asserted claims of the '250 patent. The district court entered a stipulated judgment of noninfringement of the '250 patent.

With respect to the '654 patent, Wi-LAN alleged both direct and induced infringement. The parties filed cross-motions for summary judgment on the issue of infringement. The district court explained that Wi-LAN has known that it could not establish infringement without establishing that the source code of Sharp's and Vizio's systems actually practiced the patented method.

The district court granted Sharp and Vizio's motion for summary judgment of noninfringement, holding that Wi-LAN lacked sufficient admissible evidence to prove direct infringement. The district court found that the printout of the source code that Wi-LAN sought to use as evidence was inadmissible.

Wi-LAN appealed in each case. Because the underlying cases were related, this court consolidated the appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I

With respect to the '654 patent, Wi-LAN challenges the district court's grant of summary judgment of noninfringement to Vizio and Sharp.[1] We review a grant of summary

---

[1]    On appeal, Wi-LAN also argues that the district erred in certain discovery rulings that adversely affected its ability to prove induced infringement of the asserted claims of the '654 patent. Because we hold that Wi-LAN

judgment de novo. *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1164 (Fed. Cir. 2015) (citing *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012)).  We apply regional circuit law to evidentiary determinations. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1285 (Fed. Cir. 2020).  The Third Circuit reviews a district court's evidentiary rulings for abuse of discretion. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

The district court granted summary judgment because Wi-LAN had failed to provide admissible evidence of the source code that Wi-LAN needed to prove its infringement theories as to claims 1, 4, and 9.[2]

---

cannot establish direct infringement, we do not need to reach these issues related to induced infringement.

[2]    Claim 1 of the '654 patent (the only asserted independent claim) provides:

1. A method for displaying interlaced video data on a non-interlaced monitor, the interlaced video data comprising a plurality of paired fields, each pair of fields being vertically offset relative to each other by one-half of a field line spacing distance, each field comprising a plurality of lines of video data, the method including:

(a) capturing a first field and a second field of each pair of fields into respective buffers;

(b) scaling each of the first field and second field of each pair of fields to fill vertical resolution of the non-interlaced monitor;

(c) adjusting one of the first field or second field of the pair of fields to substantially correct for the

Wi-LAN supplied documents from the third-party chip manufacturers purported to be the source code printouts together with declarations from employees of the manufacturers purporting to authenticate the source code printouts. The declarations stated that the source code "provide[d] the implementation of the deinterlacing process for digital video data in a specified list of chips" and "add[ed] that there [we]re 'no material differences' between the version of code produced and any versions used since 2009." J.A. 26–27 (footnote omitted). The source code included "added commentary on the printed excepts." J.A. 29. The district court held that this evidence was inadmissible and that Wi-LAN had failed to raise a genuine issue of material fact as to noninfringement. On appeal, Wi-LAN has several theories as to why the district court erred and why the source code printout was admissible.

A

Wi-LAN argues that the source code printout constituted a business record, admissible under the business records exception to the hearsay rule. "The business records exception allows admission of records of regularly conducted activity through the testimony of a custodian or

---

vertical offset between the pairs of fields, where said adjusting is performed concurrently with said scaling;

(d) displaying the first field of each pair of fields on the non-interlaced monitor in a first time period; and

(e) displaying the second field of each pair of fields on the non-interlaced monitor in a second time period subsequent to the first time period.

'654 patent, col. 10 ll. 46–65.

other qualified witness." *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1392 (Fed. Cir. 2010) (citing Fed. R. Evid. 803(6)). Specifically, the hearsay exception of Rule 803(6) permits a "record" that meets the following five requirements to be admitted into evidence:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all of these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification;[3] and
>
> (E) the opponent does not show that the source of information or the method or circumstance of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). "[I]f the proponent has established the stated requirements of the exception—regular business with regularly kept record, source with personal knowledge, record made timely, and foundation testimony

---

[3]    Under Rule 902(11), a domestic record is self-authenticating if it "meets the requirements of Rule 803(6)(A)–(C), as shown by a certification of the custodian or another qualified person," and the adverse party had "reasonable written notice of the intent to offer the record . . . so that the party has a fair opportunity to challenge [it]." Fed. R. Evid. 902(11).

or certification—then the burden is on the opponent to show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6) advisory committee's notes to 2014 amendments.

To establish that the source code printout was an admissible business record under Rule 803(6), Wi-LAN was required to establish by testimony from a "custodian or other another qualified witness" that the documents satisfied the requirements of the Rule. Wi-LAN argues that it properly authenticated the source code printout through the declarations of the chip manufacturers' employees. We agree with the district court that the declarations could not be used to authenticate the source code printout on the theory that the declarations were a proxy for trial testimony or themselves admissible as business records.

As Wi-LAN notes, declarations are typically used at summary judgment as a proxy for trial testimony. But declarations cannot be used for this purpose unless the witness will be available to testify at trial. Under Federal Rule of Civil Procedure 56(c)(2), Wi-LAN was required to "explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's notes on 2010 amendments. Wi-LAN argued that it met this burden by explaining that the declarants were available to testify at trial. The district court, however, found the opposite. Indeed, when asked by the court at the summary judgment hearing whether the declarants would appear at trial, Wi-LAN's counsel responded that Wi-LAN did not "think that [it would be] able to force them to come to trial." J.A. 15,398–99.

Wi-LAN thus did not establish that the declarants would be available to testify at trial and, as a result, the declarations could not be used as a substitute for trial testimony. *E.g.*, *Fraternal Order of Police, Lodge 1 v. City of*

*Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (testimony admissible if declarants were available to testify at trial); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) ("[H]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that 'would be admissible at trial.'" (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 465 n.12 (3d Cir. 1989)).

Wi-LAN also seems to argue that it properly authenticated the source code printout because the declarations were custodial declarations that were themselves admissible as business records under Rule 803(6). Wi-LAN, however, admits that it obtained the source code printout and declarations by filing lawsuits against the manufacturers and then dismissing the lawsuits without prejudice after the manufacturers provided Wi-LAN with the source code printout and declarations it sought. Wi-LAN even explains that "[t]he lawsuits were necessary to secure production of the source code and declarations because [the system-on-chip manufacturers] had refused to cooperate in discovery." Appellant's Br. 51. The declarations thus do not constitute a "record [that] was kept in the course of a regularly conducted activity of a business." Fed. R. Evid. 803(6)(B). Instead, the declarations were created and prepared for the purposes of litigation, placing them outside the scope of the exception. As a result, the declarations were not admissible as business records for use to authenticate the source code printout.

Wi-LAN argues alternatively that, under Third Circuit law, these deficiencies in the declarations did not preclude their use. It bases its theory on the Third Circuit's view that "the testimony of the custodian or another qualified witness" under Rule 803(6)(D) "can be met by documentary evidence, affidavits, or admissions of the parties, *i.e.*, by circumstantial evidence, or by a combination of direct and

circumstantial evidence." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 288 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The Third Circuit adopted this view after concluding that "[i]t would make little sense to require live witness testimony every time a business record is offered when, from the other materials open for the court's consideration, it can make the required finding to its own satisfaction." *Id.*

The Third Circuit's approach runs counter to the text of Rule 803(6), which requires the conditions of the Rule to be shown "by the testimony of the custodian or another qualified witness[] or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D). Its view appears not to have been widely adopted. *See* 5 *Weinstein's Federal Evidence* § 803.08[c] & n.76. But even under this approach, the declarations do not suffice because Wi-LAN does not meet Rule 803(6)'s final requirement that "the opponent does not show that the source of information or the method or circumstance of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E).

The district court concluded that Sharp and Vizio "have demonstrated a lack of trustworthiness in the materials; the source code contains inconsistent dates in the metadata, copyright, and revisions histories as well as added commentary on the printed excerpts." J.A. 29. The court also found that Wi-LAN "failed to obtain change logs, file comparisons, or other evidence of code revisions that might clear up the inconsistencies in the code." J.A. 29. And the district court found that

> [t]he circumstances surrounding the production, including the fact that the [system-on-chip] manufacturers originally claimed that they could not produce one version of source code for all [system-

on-chips] at issue in the case, raise[d] further con-
cern as to the credibility of both the source code and
the [system-on-chip] declarations seeking to au-
thenticate the code.

*Id.* The Third Circuit has affirmed a district court's deci-
sion to not admit records on similar grounds. *See SEC v.
Hughes Capital Corp.*, 124 F.3d 449, 456 (3d Cir. 1997)
(holding that a district court did not abuse its discretion in
refusing to admit altered copies of a record under Rule
803(6) because the records indicated "a lack of trustworthi-
ness").

The district court did not abuse its discretion in holding
that the source code printout does not constitute a business
record admissible under Rule 803(6).

B

Wi-LAN also appears to argue that the district court
should have found the source code printout admissible un-
der Federal Rule of Evidence 901(b)(4). Rule 901(b)(4) per-
mits a record to be admitted into evidence if "[t]he
appearance, contents, substance, internal patterns, or
other distinctive characteristics of the item, taken together
with all the circumstances" "support a finding that the item
is what the proponent claims it is." Fed. R. Evid. 901(a),
(b)(4).

In support of its Rule 901(b)(4) argument, Wi-LAN
states only that "there was no legitimate reason to question
the trustworthiness of the source code." Appellant's Br. 54.
The district court concluded that the source code printout's
"appearance, contents, substance, internal patterns, [and]
other distinctive characteristics," Fed. R. Evid. 901(b)(4),
did not satisfy Rule 901(b)(4)'s strictures "given the highly
dubious circumstances surrounding the production and the
lack of indicia of trustworthiness in the source code," J.A.
30, as described in the previous Section. On this record,

the district court did not abuse its discretion in refusing to treat the source code printout as evidence under Rule 901(b)(4).

C

Wi-LAN alternatively argues that the source code printout should have been admitted into evidence under Federal Rule of Evidence 703.[4] Wi-LAN's expert submitted a report stating that Sharp's and Vizio's television sets infringe the claimed methods of the '654 patent by the use of the source code. Wi-LAN's expert did not attempt to authenticate the source code printout. But Wi-LAN argues that its expert should be able to opine on the meaning of the inadmissible source code printout and to provide the inadmissible source code printout to the jury despite Wi-LAN's failure to authenticate the source code printout.

Wi-LAN's argument presents two separate and distinct questions: (1) whether the source code printout was admissible because it was relied on by the expert and (2) whether the expert's testimony relying on the source code was admissible to establish infringement. The answer to the first question is "no" because expert reliance does not translate

---

[4]    An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

14        WI-LAN INC. v. SHARP ELECTRONICS CORPORATION

to admissibility.  The answer to the second question is also "no" because Wi-LAN did not establish that experts in the field "reasonably rely on" unauthenticated source code.

As to the first question, "Rule 703 does not make admissible otherwise inadmissible evidence."  4 *Weinstein's Federal Evidence* § 703.05 n.12.  That is because "Rule 703 is not, itself, an exception to or exclusion from the hearsay rule or any other evidence rule that makes the underlying information inadmissible." *Id.* § 703.05.  Rule 703 does not authorize admitting inadmissible evidence "on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the [inadmissible evidence] other than transmitting [it] to the jury."  29 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, *Federal Practice and Procedure* § 6274 (2d ed. 2020).  "In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control." *Id.*  Rule 703 permits the proponent of an expert's opinion to disclose the underlying material to a jury if "experts in the particular field would reasonably rely on" the underlying material and "if [the underlying material's] probative value in helping the jury evaluate the opinion substantially outweighs [its] prejudicial effect."  Fed. R. Evid. 703.  But "the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes."  Fed. R. Evid. 703 advisory committee's notes to the 2000 amendments.  These principles have been reaffirmed repeatedly.

Exemplary is the Second Circuit's decision in *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), where the court held that the government's expert witness could not simply repeat hearsay to the jury.  The Second Circuit explained that the expert "identified hearsay as the source of much of his information" during cross-examination and "did not analyze his source materials so much as repeat their contents." *Id.* at 197–98.  Because the expert simply provided

second-hand evidence to the jury, the court held that the expert's testimony fell outside the permissible bounds of Rule 703. *Id.* at 198.

The Second Circuit reached a similar conclusion in *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013). There, the Second Circuit held that, although Rule 703 "permit[ted] experts some leeway" in basing their opinions on inadmissible evidence, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Id.* at 136 (citation omitted). Rather, the court explained, "[t]he appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *Id.*

Similarly, the Fifth Circuit has explained that "[c]ourts . . . must serve a gate-keeping function with respect to Rule 703 opinions to ensure 'the expert isn't being used as a vehicle for circumventing the rules of evidence.'" *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992)). The court further explained that "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" *Id.* (citation omitted).

In *United States v. Tomasian*, 784 F.2d 782 (7th Cir. 1986), the Seventh Circuit held that the trial court correctly prevented an expert from testifying when the expert did not plan to offer his own opinion but, instead, planned to repeat the out-of-court opinion of another person. *Id.* at 786. The court explained that "Rule 703 does not sanction

the simple transmission of hearsay; it only permits an expert opinion based on hearsay." *Id.*[5]

*United States v. Rollins*, 862 F.2d 1282 (7th Cir. 1989), cited in the advisory committee notes to Rule 703, is also informative.  There, the Seventh Circuit noted that it would be "improper" to use an expert as a "mouthpiece" to relay hearsay to the jury but held that the expert could properly give testimony interpreting hearsay because experts in the relevant field "ordinarily relied" on hearsay in reaching their opinions.  *Id.* at 1293.

Here, the district court concluded that the source code printout could not be admitted under Rule 703 because it was not authenticated and, as a result, Wi-LAN was attempting to use Rule 703 as a "'backdoor' to allow the admission into evidence of otherwise inadmissible declarations and other materials simply because they might assist the jury's evaluation of an expert's opinions." J.A. 31.  We agree.  Wi-LAN attempts to do exactly what is impermissible under Rule 703 by using its expert as a substitute for a fact witness to circumvent the rules of evidence to admit otherwise inadmissible evidence.

As to the second question (the admissibility of the expert's testimony as to infringement), under Rule 703, "[d]ata relied on by the expert 'need not be admissible for the opinion to be admitted' if experts in the field would reasonably rely on such data."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373

---

[5]    *See also United States v. Smith*, 869 F.2d 348, 355 (7th Cir. 1989) ("It is, of course, true that an expert witness may not simply summarize the out-of-court statements of others as his testimony."); *United States v. Lawson*, 653 F.2d 299, 302 (7th Cir. 1981) ("The Government could not, for example, simply produce a witness who did nothing but summarize out-of-court statements made by others.").

(Fed. Cir. 2013) (quoting Fed. R. Evid. 703). "[I]t is the judge who makes the determination of reasonable reliance, and . . . for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a type of data *reasonably* relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994). The burden to establish reasonable reliance is on the proponent of challenged expert testimony. *See id.* at 743–44, 747–48.

Wi-LAN argues that experts typically rely on material, like source code, in reaching opinions about infringement. That is obviously correct. But Wi-LAN has not made a showing that source code experts reasonably rely on unauthenticated source code printouts.

In support of its position, Wi-LAN cites *Factory Mutual Insurance Co. v. Alon USA L.P.*, contending that the case stands for the proposition that experts can reasonably rely on inadmissible evidence (out-of-court statements as to property value) to reach their conclusions as appraisers. There, the Fifth Circuit permitted the testimony "[i]n light of the deferential standard on appeal" because the expert "clearly state[d] that the sort of information relied upon here—the opinions of others—is the sort of information reasonably relied upon by appraisers." 705 F.3d at 525. Wi-LAN points to no similar testimony by its expert here.

Wi-LAN's conclusory statement that "the declarations and source code evidence are the type of information that an expert 'would reasonably rely on . . . in forming an opinion' under FRE 703," J.A. 15,454, is not sufficient. *See Schuchardt v. President of the United States*, 802 F. App'x 69, 76 (3d Cir. 2020) (holding that simply asserting that certain "documents are the 'type of data that experts in the intelligence community would typically and reasonably rely upon'" "provided no basis for the Court to conduct an

independent evaluation into reasonableness" under Rule 703).

The district court did not abuse its discretion in rejecting Wi-LAN's theory under Federal Rule of Evidence 703.[6]

D

In light of these admissibility issues, Wi-LAN's fallback position is that the district court should have granted it additional time to obtain an admissible version of the source code. We disagree. Wi-LAN had ample time to obtain the source code and to find custodial witnesses to authenticate the source code over the course of discovery but failed to do so.

Wi-LAN had been on notice since early 2016 that it was going to need the system-on-chip source code from third parties to prove its direct infringement case. Throughout the litigation, Wi-LAN repeatedly requested extensions of time to obtain the source code from the third-party manufacturers. Ultimately, however, Wi-LAN only procured a single printout version of the source code with declarations after suing the third-party manufacturers.

Wi-LAN, as the district court found, "had ample time and opportunities over years of litigation to obtain evidence of infringement from the [system-on-chip] manufacturers" but failed to do so. J.A. 32. Given this record, the district court did not abuse its discretion in denying Wi-LAN an additional opportunity to obtain an admissible form of the source code.

---

[6] We have reviewed Wi-LAN's other arguments concerning the admissibility of the source code printout and declarations and find them to be without merit.

II

With respect to the '250 patent, Wi-LAN challenges the district court's construction of two claim limitations: (1) "output multimedia data stream" and (2) "a multimedia processor, coupled to the data rate analyzer." We review a district court's ultimate claim construction de novo where, as here, there is no extrinsic evidence that bears on the claim construction. *Allegan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019).

The two limitations at issue appear in each of the asserted claims. Claim 1, the one asserted independent claim on which the other two asserted claims depend, provides:

> 1. In a system for combining input multimedia data streams to form an *output multimedia data stream*, an apparatus for adjusting rates of the input multimedia data streams comprising:
>
> a data rate analyzer, coupled to the *output multimedia data stream*, for determining the data rate of the *output multimedia data stream*; and
>
> *a multimedia processor, coupled to the data rate analyzer*, for comparing the determined *output multimedia data stream* data rate to a target output data stream data rate, and generating rate control signals for adjusting the data rates of the input multimedia data streams responsive to the comparison.

'250 patent, col. 9 ll. 28–41 (emphases added).

The district court construed "output multimedia data stream" to mean a "combined audio and video stream that are output from the system." J.A. 68. Wi-LAN argues that "the limitation imposed by the court's construction . . . — that it must be 'output from the system'—is not supported by any intrinsic evidence." Appellant's Br. 61. In

Wi-LAN's view, the district court's construction improperly limits the claims because the plain meaning of the term "is not restricted to any device or system." *Id.* at 61–62. We disagree.

The '250 patent's specification explains that the "claimed input multimedia data streams" are combined into a single output data stream within the claimed "integrated multimedia encoding system" and that that system transmits the data stream to other components of the larger computer system. *E.g.*, '250 patent, col. 3, ll. 14–19 ("The *output* of the integrated multimedia encoding system 120 *is transmitted to a communications device 112* for transporting the encoded and multiplexed data or a storage medium 116 for storage of the program or transport stream data, or a decoder for decoding the data for playback." (emphases added)); *id.* col. 4 ll. 14–17 ("The combined stream data 224 is stored back into the unified memory module 204. Bus 122 is used to access the combined stream data 224 for *transmission to other components* of the system 100." (emphasis added)).

The '250 patent's description of its figures adds further support for the district court's construction. For example, the specification explains that, in Figure 2, which "illustrates the [claimed] integrated multimedia encoding system 120," *id.* col. 3 ll. 23–24, "the combined stream data 224 for transmission to other components of the system 100." *Id.* col. 4 ll. 15–17. Similarly, the specification explains that, as illustrated in Figure 1, "[t]he output of the integrated multimedia encoding system 120 is transmitted to a communications device 112 for transporting the encoded and multiplexed data or a store medium 116 for storage of the program or transport stream data, or a decoder for decoding the data playback." *Id.* col. 3 ll. 14–19. The specification also describes Figure 7 as showing "the data 224 . . . temporarily [being] written back to memory 204, *for later transfer to* the communications device 112, or

other recipient of the Program or Transport Stream 224." *Id.* col. 6 ll. 23–26 (emphasis added).  In each of these examples, the output multimedia data stream is being output from the integrated multimedia encoding system.  The district court's construction of "output multimedia data stream" as a "combined audio and video stream that are output from the system" was correct.

Next, we address the construction of "a multimedia processor, coupled to the data rate analyzer."  The district court construed this limitation to mean "a multimedia processor connected to the data rate analyzer, where the multimedia processor is separate from, and not a sub-component of, the data rate analyzer."  J.A. 70.  The district court's construction was based on the patent's consistent use of "coupled" "to refer to components that are not sub-components of each other" and "in" "to refer to components that could be sub-components of each other."  J.A. 71.  Wi-LAN asserts that the district court "incorrectly limited the plain meaning of the term 'couple'—i.e., 'connected'— by further requiring 'the multimedia processor [to be] separate from, and not a sub-component of, the data rate analyzer.'"  Appellant's Br. 63 (quoting J.A. 70).  Further, Wi-LAN contends that the district court "improperly extracted a limitation from the specification based on exemplary embodiments without identifying evidence that the patentee intended the claims to be so limited, let alone evidence that would meet the strict standards for clear disavowal of claim scope."  Appellant's Br. 64 (quoting J.A. 70–71).  We reject Wi-LAN's arguments and conclude that the district court's construction of this limitation was correct.

## CONCLUSION

For the reasons stated above, the district court's judgment is affirmed.

## **AFFIRMED**